UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

DAVID TROUPE,

                    Plaintiff,

          v.

KENNETH R. BRODHEAD, LINDA W.
BELANGER, and KEVIN WALKER,

                    Defendants.

No. CV-13-5028-EFS

**ORDER STRIKING IN PART AND
DENYING IN PART PLAINTIFF'S
MOTION FOR A TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

        On August 6, 2013, the Court held a telephonic hearing on *pro* se

Plaintiff David Troupe's Motion for a Temporary Restraining Order and

Preliminary Injunction, ECF No. 16.  Plaintiff and Amy Clemmons, who

is counsel for Defendants, participated.  After reviewing the filings

and relevant authority and hearing oral argument, the Court was fully

informed.  This Order memorializes and supplements the Court's oral

order striking in part (temporary-restraining-order request) and

denying in part (preliminary-injunction request) Plaintiff's motion.

**A.    Background**

        Plaintiff received a twenty-year imprisonment sentence for three

counts of robbery.  ECF No. 12, Attach. 5b.  He has served

approximately 15 years, including time at Stafford Creek Corrections

Center (SCCC) and the Walla Walla State Penitentiary (WWSP).

Plaintiff, who has a history of engaging in self-harm, has been

diagnosed with posttraumatic stress disorder, recurring major depression, inability to control impulses, and borderline personality disorder. ECF No. 30, Attach. 7. When housed at SCCC, Plaintiff removed stitches in his leg to inflict self-harm and attempted to break a toilet from the wall. *Id.*, Attach. 3a. SCCC placed him in prolonged restraints. *Id.* Since approximately July 23, 2010, Plaintiff has been housed at WWSP in the Intensive Management Unit-North (IMU-N) with a no-razor restriction. *Id.* WWSP requires an inmate to have ninety days of good behavior before a transfer request will be considered.

On August 23, 2010, Plaintiff cut his left wrist. ECF No. 12, Attach. 5b. At that time, Plaintiff had approximately 154 infractions during his then-twelve years of incarceration. *Id.*

In a September 14, 2010 email, Defendant Linda Belanger states,

Congratulations! Might be a little premature but Troupe said that he was going to come to IMU to "get his 90 days over with." Chris, it would appear that the little guy did think his situation over and decided that having his time not count in the HSB was not something he wanted to do. I don't think he was having much fun there and came back and told Walker that he was done. Good job and thank you for the support.

ECF No. 30, Attach. 6c. Defendant Belanger's email "signature" was "Speak softly and carry a big stick; you will go far." *Id.*

On September 27, 2010, Defendant Belanger documented that Plaintiff was picking at the sutured laceration on his lower leg because he was unhappy that he could not immediately go to the Mental Health Unit (MHU) for a "time out." ECF No. 28, Attach. A at 5. Defendant Belanger advised Plaintiff that he needed to wait until the

1   MHU had an open seclusion room. *Id.* Plaintiff was unhappy about the
2   wait and so continued to remove all of the sutures and made a new
3   laceration on his leg as well. *Id.*

4        In an October 7, 2010 "Week in Review" email, Amy Evenson, a
5   psychologist associate with the IMU-N, discussed the status of
6   inmates who were likely to require more staff attention over the
7   weekend. ECF No. 30, Attach. 6a. Plaintiff was included on this
8   inmate list. *Id.* Ms. Evenson states:

> Well, Mr. Munchkin [Plaintiff] has FINALLY decided to man
> up and start his IMS program with us in the North. . . .
> The CUS, Sergeant, and myself are in the midst of
> developing his 'contract' and if he does request mental
> health assistance over the weekend, this might be a good
> thing to mention (wink, wink) to deter him from requesting
> to go to the MHU, i.e., going there could jeopardize the
> "good parts" of the contract for him.

*Id.*

    On November 8, 2010, Plaintiff filed an emergency grievance
claiming that he was sexually assaulted and harassed by Defendant
Brodhead on November 3, 2010. ECF No. 12, Attach. 1. On November 9,
2010, Plaintiff filed a grievance complaining that Defendant Belanger
failed to keep Officer Brodhead away from him. *Id.*, Attach. 4.
Plaintiff was advised that his grievance would be processed but that
he could also contact mental health to assist him with dealing with
stress. *Id.*

    On November 11, 2010, Plaintiff filed a grievance wherein he
stated that, notwithstanding his complaint of sexual harassment and
assault against Defendant Brodhead, Defendant Brodhead continued to
contact and intimidate Plaintiff. *Id.*, Attach. B; ECF No. 28,

**ORDER** – 3

Attach. A at 10.    Plaintiff was advised that the sexual harassment issue was being handled via the Prison Rape Elimination Act (PREA) process, and that the intimidation issue would be considered with a previously-filed grievance.    ECF No. 28, Attach. A at 10; ECF No. 12, Attach. B.

On November 16, 2010, Plaintiff filed a grievance contending that Defendant Brodhead deliberately worked extra hours in IMU-N in order to harass Plaintiff.    ECF No. 28, Attach. A at 13.    The grievance coordinator found Plaintiff's concern was unsupported as Defendant Brodhead was working his assigned schedule.    *Id.*

On November 18, 2010, Plaintiff intentionally cut his leg with his fingernail.    *Id.*, Attach. A at 7.    He advised the mental health counselor that he would continue to harm himself and assault staff until he was transferred to SCCC IMU.    *Id.*

On November 19, 2010, Plaintiff filed a grievance wherein he 1) complained that Defendant Belanger allowed Defendant Brodhead to continue to harass him, and 2) requested that Defendant Brodhead not contact him.    ECF No. 28, Attach. A at 9.    Officer Charles Pease investigated the grievance and found that Defendant Belanger had appropriately cautioned Plaintiff that in order to get his requested 90-day rotation to another IMU he needed to positively program at IMU-N for 90 days.    *Id.*    Officer Pease also advised Plaintiff that the allegation regarding Defendant Brodhead was being handled through a different investigation.    *Id.*

Also on November 19, 2010, a Psychology Suicide Risk Assessment was performed by Psychologist Mary Jo Moeschi.    ECF No. 12, Attach.

5a.  Dr. Moeschi addressed Plaintiff's continued threats of self-harm. *Id.*  She states Plaintiff "is very bright, and when I interviewed him he indicated that he was very frustrated because he has been here approximately 120 days." *Id.*  Dr. Moeschi called Defendant Belanger to clarify Plaintiff's status at IMU-N. *Id.* Defendant Belanger relayed that because Plaintiff engaged in self-harm he would have to restart his 90-day rotation. *Id.*  Dr. Moeschi relayed this information to Rick Cross, RMHPM.  Until Mr. Cross made a decision, Dr. Moeschi recommended continuing self-harm precautions and regularly evaluate Plaintiff. *Id.*

On November 24, 2010, Plaintiff filed a grievance contending that Defendant Belanger's decision to deny transfer to a different IMU violated Department of Corrections (DOC) policy.  ECF No. 28, Attach. A at 14.  Plaintiff was advised that transfer decisions are not grieveable. *Id.*

On November 29, 2010, Plaintiff grieved that he was inappropriately given medication and that his modifications were not supported. *Id.*, Attach. A at 15.  He was advised that his modifications were reviewed daily by supervising staff, and they were to expire on November 30, 2010. *Id.*

On December 17, 2010, Plaintiff filed a grievance complaining that Defendant Belanger 1) provided him with contrary information as to why his transfer requests were being denied, and 2) changed Defendant Brodhead's work schedule so that he was around Plaintiff five days a week. *Id.*, Attach. A at 8.  DOC Investigator Katelyn Daugherty reviewed the grievance and responded in part, "It appears

**ORDER** – 5

1  that you may be attempting to manipulate staff in order to meet your

2  goal of transferring to another Intensive Management Unit.  In order

3  to be eligible for a transfer to another IMU, you will need to

4  stabilize by demonstrating a willingness to refrain from engaging in

5  self-harm behaviors." *Id.*

6      In December 2010, Plaintiff advised WSP health care that he

7  would begin a hunger strike if paperwork was not submitted to

8  transfer him to another IMU.  ECF No. 28, Attach. A at 7.  By

9  December 18, 2010, Plaintiff missed nine consecutive meals.  *Id.*,

10 Attach. A at 6.  As a result, a vitals, height, and weight check was

11 done by medical staff on December 18, 2010.  *Id.* It was noticed that

12 Plaintiff had cut a 4-inch wound on his left front shin.  *Id*.

13 Plaintiff was taken to the trauma room where he was treated for his

14 injuries and placed on a four-point table to protect him from harming

15 himself.  *Id.* Plaintiff stayed in MHU for the weekend.

16     On December 20, 2010, after Plaintiff returned from MHU,

17 Defendant Walker and Officer Pease conversed with Plaintiff in his

18 IMU-N cell regarding his need to improve his behavior in order to

19 transfer to a different IMU.  ECF No. 30, Attach. 3b.  During this

20 discussion, Plaintiff pulled a broken razor blade from his upper lip

21 and passed it to the officers.  *Id.* Plaintiff advised that he got

22 the razor blade from a staff member but would not name the staffer.

23 *Id.;* ECF No. 28, Attach. A at 21.  Pictures of the razor blade were

24 taken, and it was ascertained that the razor was not issued from the

25 WSP hospital or IMU units.  ECF No. 30, Attach. 3c.

26

**ORDER** – 6

On December 24, 2010, Plaintiff filed an emergency grievance complaining that Officer Brodhead, rather than the three other officers who were present, strip searched him. ECF No. 12, Attach. 8. This grievance was forwarded to the grievance coordinator. *Id.*

On December 27, 2010, Plaintiff filed an emergency grievance that Officer Brodhead continued to taunt and harass him. ECF No. 28, Attach. A at 20. Plaintiff was told that his grievance did not qualify as an emergency grievance and that it would be processed as a normal grievance. *Id.*

On December 28, 2010, Defendant Brodhead filed an Infraction Report as to Plaintiff's December 27, 2010 refusal to open his mouth so that Defendant Brodhead could confirm that the given medicine was in Plaintiff's mouth. ECF No. 12, Attach. 11.

On January 4, 2011, Plaintiff filed a Level II appeal wherein he complained that it took two hours for mental health staff to see him and that he felt unsafe at IMU-N under the supervision of Defendant Belanger. ECF No. 28, Attach. A at 16. On January 31, 2011, Superintendent Mark Kucza apologized to Plaintiff for it taking two hours for the mental health staff to come talk to him, and advised that he addressed with staff the need for quicker response time. *Id.*

Also, on January 4, 2011, Plaintiff filed an emergency grievance complaining that Officer Brodhead engaged in demeaning conduct toward him. ECF No. 12, Attach. 12. The grievance coordinator advised that the grievance did not qualify as an emergency grievance, offenders do not get to choose which staff performs a duty, and the MHU will be notified per his request. *Id.*

ORDER – 7

1    On January 6, 2011, Plaintiff signed an affidavit, which stated

2   that Defendant Brodhead sexually harassed him on October 19, 2010,

3   and then sexually assaulted him on November 3, 2010.  ECF No. 30,

4   Attach. 4.  Plaintiff also declared that Defendant Brodhead provided

5   him with a razor blade during the second week of November 2010 in

6   order for Plaintiff to kill himself.  *Id.*

7    On January 8, 2011, Plaintiff cut his leg because he was upset

8   at the booth officer whom he felt was disrespecting him.  ECF No. 30,

9   Attach. 7.  Psychologist Associate Casey Potts prepared a report of

10  the incident.  *Id.*  Potts discussed with Plaintiff other methods of

11  relieving stress, and Plaintiff appeared familiar with these options.

12  *Id.*  Plaintiff volunteered not to be disruptive so that he could

13  remain at IMU-N rather than be placed in MHU.  *Id.*  After the site

14  nurse determined that the scratch was superficial, staff agreed that

15  Plaintiff could stay in IMU-N.  *Id.*

16   On January 12, 2011, Plaintiff filed a "kite" directed to

17  Defendant Belanger inquiring why she failed to question, investigate,

18  or respond to his grievance that Defendant Brodhead gave him a razor

19  blade, stating in part, "No response.  No questions.  No

20  investigation.  A MAJOR breach of security and you ignore it?"  ECF

21  No. 12, Attach. 13b.  Defendant Belanger responded, "No questions no

22  response, no investigation.  You have shotgunned these allegations

23  out elsewhere, thus no action from me."  *Id.*

24   Also on January 12, 2011, Plaintiff filed a Level II appeal of

25  his December 29, 2010 grievance, ECF No. 28, Attach. A at 19,

26  regarding Defendant Brodhead's ability to strip search Plaintiff when

Defendant Brodhead was under investigation for sexually assaulting him and giving him a razor blade. *Id.*, Attach. A at 18. The grievance coordinator denied the grievance because Plaintiff does not get to choose who performs searches and Defendant Brodhead was accompanied by other staff. ECF No. 28, Attach. A at 19. Superintendent Kucza responded on January 25, 2011, stating that staff is assigned tasks by their supervisors and because Plaintiff is in a maximum-custody environment activities are strictly controlled. *Id.*, Attach. A at 18. Superintendent Kucza also advised that the sexual-assault and razor-blade allegations were being investigated in the PREA process. *Id.*

On February 8, 2011, Plaintiff sought leave to file a Level II appeal concerning the lack of response to his grievance that Defendant Belanger told him that he was going to "rot" at WSP IMU-N. ECF No. 12, Attach. 14. Plaintiff was given leave to file a Level II appeal. *Id.* In response to the Level II appeal, OCO Deputy Secretary/Designee stated, "It is unfortunate that this incident occurred. The Department of Corrections expects staff to interact with offenders in a professional manner at all times." ECF No. 30, Attach. 2a; *see also id.*, Attach. 2b (Ronald Knight admonished Defendant Belanger that her interactions with Plaintiff must be professional and acceptable.). Plaintiff's transfer request to IMU-South or another facility was denied; Plaintiff was advised that the "best way for you to be eligible to transfer facilities is to follow IMU procedures and expectations, and maintain positive behavior." ECF No. 30, Attach. 2a.

1    On June 16, 2011, Superintendent Steve Sinclair found that

2  Plaintiff's accusation that Defendant Brodhead engaged in

3  inappropriate sexual behavior was unsubstantiated. ECF No. 28,

4  Attach. A.  Approximately, a week earlier, Superintendent Sinclair

5  also found Plaintiff's allegations of sexual misconduct by both

6  Officer Coll and Defendant Belanger were unfounded. *Id.; see also*

7  ECF No. 28, Attach. A (noting that Plaintiff voluntarily withdrew

8  both allegations).  The razorblade allegation against Defendant

9  Brodhead was also found to be unsubstantiated.

10    On May 12, 2013, Plaintiff filed this lawsuit.[1] ECF No. 1. On

11  May 15, 2013, the Court determined service of Plaintiff's 42 U.S.C. §

12  1983 claims under the First and Eighth Amendments against Defendants

13  Kenneth Brodhead, Linda Belanger, and Kevin Walker was appropriate.

14  ECF No. 13.

15    Plaintiff filed his instant motion on June 10, 2013. Through

16  his motion, Plaintiff seeks the following relief:

17    1)    Enjoining Defendants, their co-workers, family, friends,
             successors in office, agents, employees, and all other
18           persons acting in concern and participation with them to
             provide a safe living environment away from conflict of
19           interest, threats, retaliation, and unnecessary suffering;

20    2)    Enjoin these individuals from depriving him of his
             constitutional rights;

21

22    [1] Plaintiff previously filed four other lawsuits in this

23  district in March 2013: CV-13-5029-EFS, CV-13-5036-EFS, CV-13-5037-

24  EFS, and CV-13-5038-EFS.  One was voluntarily dismissed, CV-13-5029-

25  EFS; one was dismissed by the Court on August 5, 2013, CV-13-5037-

26  EFS.  The other two lawsuits are pending.

**ORDER** - 10

3)   Requiring Defendants to provide him with mental health services with a provider that does not have a conflict of interest with Plaintiff; and

4)   Prohibiting Defendants and their coworkers and friends, including Peter Beck, Shane Miller, Thomas Roe, Walter End, Daniel Mgaruiya, Bradley Braham, Cathy Bly, David Lundren, Santos DeLeon, Brandon Rhodes, Eric McClanahan, Kevin Todd, Joseph Goodman, Kenneth Kingsley, Calvin Blackham, and Mr. Goodenough, from being within 100 feet of Plaintiff and having verbal or written contact with Plaintiff, except for unavoidable emergencies.

ECF No. 16.   Defendants oppose the motion, contending that Plaintiff failed to show that he is likely to succeed on the merits and that he has a history of manipulating the prison's grievance system in order to change his housing assignment.   ECF No. 27.   Defendants filed a declaration from Lee Young, a grievance coordinator, who stated:

> [Plaintiff] has a pattern and practice of intentionally engaging in manipulative conduct to get attention, to elicit changes in his housing assignment, or for other purposes.  He used threats of self-harm, refusing to eat, refusal to take his medications, threats of making accusations against staff, making false accusations against staff, and other similar tactics to attempt to manipulate the corrective facility processes and staff on a regular basis.

ECF No. 28 at 2.

**B.   Standard[2]**

The purpose of a preliminary injunction (PI) is to preserve the status quo and prevent a threatened wrong or further perpetration of injury until a final determination on the merits.   Fed. Prac. &

---

[2] Because Defendants appeared in this lawsuit and responded to the motion, the Court treats Plaintiff's motion as a preliminary-injunction motion, not a motion for a temporary restraining order. However, the Court recognizes the standards for both are similar.

1    Proc., 11A Fed. Prac. & Proc. Civ. § 2947 (2d ed.).    Federal Rule of

2    Civil Procedure 65 governs the procedure for PI requests, while case

3    law sets forth the standards to apply to assess whether a PI should

4    be entered.

5        To obtain a PI, Plaintiff must establish 1) he is likely to

6    succeed on the merits, 2) he is likely to suffer irreparable harm in

7    the absence of preliminary relief, 3) the balance of equities tips in

8    his favor, and 4) a PI is in the public interest.    *See Winter v.*

9    *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).    Under the

10   Ninth Circuit's "sliding scale" approach, these elements are

11   "balanced, so that a stronger showing of one element may offset a

12   weaker showing of another."    *Alliance for the Wild Rockies v.*

13   *Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).    "[A]t an irreducible

14   minimum," Plaintiff "must demonstrate a fair chance of success on the

15   merits, or questions serious enough to require litigation."    *Guzman*

16   *v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009).

17   **C.    Analysis[3]**

18        1.    Likelihood of Success on the Merits

19        Plaintiff contends he is likely to succeed on his Eighth

20   Amendment deliberate indifference and First Amendment retaliation

21

22        [3]    Plaintiff seeks relief based on conduct committed by

23   individuals who are not Defendants, including Peter Beck and Walter

24   End.    Because Messrs. Beck and End are not Defendants in this

25   lawsuit, the Court will not consider their conduct when weighing the

26   PI factors.

**ORDER** - 12

1   claims because Defendants violated their own policies and practices.

2   Defendants dispute that Plaintiff can show he is likely to succeed,

3   especially since his grievances have been resolved through the

4   prison's internal processes, including the kite, PREA, and grievance

5   processes.

6          a.   *Retaliation*

7          To establish a claim for retaliation in violation of Plaintiff's

8   First Amendment right, Plaintiff must show: 1) a prison official took

9   adverse action against him because of his protected conduct, 2) that

10  action chilled his exercise of his constitutional rights, and 3) the

11  action did not advance a legitimate correctional goal. *See Wood v.*

12  *Beauclair*, 692 F.3d 1041, 1051 (9th Cir. 2012); *see also Rizzo v.*

13  *Dawson*, 778 F.2d 527, 531-32 (9th Cir. 1985) (recognizing a prisoner

14  has a right under the First Amendment to be free from prison

15  transfers or reassignments made in retaliation for filing a

16  grievance).   There is no dispute that Plaintiff exercised his First

17  Amendment free-speech right by filing grievances, kites, and PREA

18  complaints.   The dispute is whether Defendants took adverse action

19  against him because he exercised his free-speech right and whether

20  this action chilled Plaintiff's free speech and did not advance a

21  legitimate correctional goal.   Accordingly, the Court focuses on

22  these disputed elements when assessing the strength of Plaintiff's

23  retaliation claim.

24         Plaintiff contends that Defendant Brodhead retaliated against

25  him for reporting sexual assault/harassment by providing him with a

26  razor blade and continuing to harass and intimidate him, and that the

other Defendants retaliated against him by permitting Defendant
Brodhead to continue to subject Plaintiff to this treatment and by
denying his request for a transfer out of IMU-N. In large measure,
Plaintiff's underlying grievances, kite, and PREA were found to be
unsubstantiated by the prison officials. However, he did prevail on
his grievance that Defendant Belanger inappropriately commented that
he would "rot" in IMU-N if he failed to abide by WWSP's policies and
on another grievance regarding mental health's response time.
However, there is no evidence that these two substantiated incidents
were motivated by the desire to retaliate against Plaintiff for
exercising his free-speech right.

    Plaintiff also claims that Defendants retaliated against him by
failing to approve his transfer request. There is no dispute that
Plaintiff's transfer requests have been denied; however, there is no
documentation before the Court that Plaintiff has satisfied WWSP's
ninety-day good-behavior requirement in order to earn a transfer.
This WWSP ninety-day requirement serves the legitimate purpose of
encouraging inmates to behave appropriately. Therefore, this policy
is reasonably related to a legitimate penological interest. *See*
*Turner v. Safley*, 482 U.S. 78, 85 (1987) ("[W]hen a prison regulation
impinges on inmates' constitutional rights, the regulation is valid
if it is reasonably related to legitimate penological interests.").

    It may be possible for Plaintiff to prove that Defendants
intentionally harassed him knowing that due to his mental health
issues he would harm himself if harassed and thereby be unable to
satisfy the ninety-day good-behavior requirement. However, at this

time, the Court finds Plaintiff has not established that he is likely to establish that Defendants took adverse action against him because he engaged in free speech. Plaintiff also has not shown that he is likely to show that Defendants' conduct had a chilling effect on Plaintiff's free-speech right. Plaintiff has persistently exercised his free-speech right since the fall of 2010 and continues through today. Therefore, based on the current record, the Court determines Plaintiff has not made a strong showing that he is likely to prevail on his retaliation claim.

b. <em>Eighth Amendment: Deliberate Indifference</em>

Plaintiff also claims Defendants have been deliberately indifferent to his medical needs. To prevail on his Eighth Amendment claim, Plaintiff needs to establish "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This is established by proving: 1) "a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain," and 2) Defendants' response to the need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted). "This second prong—defendant's response to the need was deliberately indifferent—is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id*

There is no question that Plaintiff has serious mental health issues and that cutting himself can result in a serious medical need.

1  However, there is little evidence that Defendants failed to treat his

2  mental health conditions or respond to the physical injuries

3  resulting from his cutting.  On one occasion, it did take mental

4  health staff two hours to visit him, which resulted in Plaintiff

5  inflicting unnecessary and wanton pain on himself.  However,

6  Superintendent Kuzca responded to Plaintiff's grievance about this

7  incident, apologized for the delay, and reminded staff that response

8  times must be quicker.  There is no indication that Defendants were

9  involved in this situation, or that WWSP purposefully or deliberately

10  failed to act.  Accordingly, based on the present record, the Court

11  finds Plaintiff failed to show that he is likely to succeed on his

12  Eighth Amendment deliberate-indifference claim.

13       2.   Likelihood of Suffering Irreparable Harm in the Absence of

14            Preliminary Relief

15       The record before the Court pertains to Defendants' 2010 and

16  2011 interactions with Plaintiff.  There is no verified information

17  or documentation regarding Defendants' current treatment and

18  interaction with Plaintiff.  Accordingly, it is difficult to assess

19  whether irreparable harm will occur in the absence of preliminary

20  relief.  *See O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past

21  exposure to illegal conduct does not in itself show a present case or

22  controversy regarding injunctive relief . . . if unaccompanied by any

23  continuing, present adverse effects.").  In addition, it is likely

24  that the physical and emotional harm that Plaintiff suffers is due to

25  his own irrational self-harming behavior.  Entry of the requested PI

26

**ORDER** - 16

1    may not prevent Plaintiff from inflicting further self-harm given

2    that Plaintiff inflicted self-harm before being housed at IMU-N.

3        3.    Balance of Hardships

4        The balance of hardships is difficult to assess based on the

5    disputed record.    If Defendants are intentionally "messing" with

6    Plaintiff in order to cause him to engage in self-harm behavior and

7    prevent him from earning ninety days of good behavior, then the

8    resulting harm to Plaintiff is substantial.    Prison officials are to

9    engage in their responsibilities professionally and treat inmates

10   appropriately.

11       However, if Plaintiff is filing grievances containing false

12   accusations against prison staff, then granting preliminary-

13   injunctive relief harms WWSP's ability to effectively operate its

14   facility and supervise its inmates.    Intruding on WWSP's ability to

15   designate what staff can interact with Plaintiff could substantially

16   burden the WWSP's administration.    *See Turner*, 482 U.S. at 84-85

17   ("Running a prison is an inordinately difficult undertaking that

18   requires expertise, planning, and the commitment of resources, all of

19   which are peculiarly within the province of the legislative and

20   executive branches of government.").    Therefore, at this time, the

21   Court finds the balance of equities is neutral.

22       4.    Public Interest

23       The public has an interest in ensuring that prison officials

24   abide by the law and professionally treat inmates.    The public also

25   has an interest in ensuring that prisons have the ability to

26

1    effectively operate prisons.   Based on the present record, the Court

2    finds this factor is also neutral.

3    **D.    Conclusion**

4          After considering the PI factors, the Court determines Plaintiff

5    fails to establish the necessity for a PI at this time.   At the

6    hearing, the Court ordered Defendants to file a status report as to:

7    1) whether Plaintiff is available for a transfer at this time and, if

8    not, why is Plaintiff not available for a transfer; 2) the longest

9    duration that Plaintiff has been infraction free at WWSP and the

10   identified time frame for that duration; 3) what is WWSP's video

11   retention policy since 2010; and 4) whether videos during the time

12   period relevant to this lawsuit contain audio.

13         For the above given reasons, **IT IS HEREBY ORDERED:**

14         1.    Plaintiff's Motion for a Temporary Restraining Order and

15               Preliminary Injunction, **ECF No. 16**, is **STRICKEN** (TRO) **and**

16               **DENIED IN PART** (PI).

17         2.    Defendants shall file the above-identified status report

18               no later than August 26, 2013.

19         **IT IS SO ORDERED.**   The Clerk's Office is directed to enter this

20   Order and provide copies to Mr. Troupe and counsel.

21         **DATED** this 20th  day of August 2013.

22

23                      _____s/ Edward F. Shea__ _ _____

                                     EDWARD F. SHEA

24                         Senior United States District Judge

25

26